Good morning, Your Honors. May it please the Court, Rebecca Jones on behalf of Mr. Muro-Inclain. I would like to reserve two minutes for rebuttal. The trial court erred in admitting a correctional officer's lay opinion testimony in this case about Mr. Muro's role in the gang because, one, it lacked adequate foundation, two, it necessarily relied on hearsay, and three, it blurred the line between lay and expert testimony. The first two issues, the lack of foundation and the necessary reliance on hearsay testimony, are necessarily intertwined because if you look at the record, the only information that Officer Ogle apparently relied on to make his determination about Mr. Muro's role in the gang, and I should say the only information that the jury heard that he relied on, I think he was relying on something more, but all they heard was watching Mr. Muro walk around the unit and talk to a number of different people, and there's no way from that type of information that a lay person could infer that someone's a member of a gang, much less someone's role in the gang. True. True. Didn't he also, when the Sally Port door opened, didn't he rush to it? When the guard opened it, didn't he rush toward the, I mean, doesn't the videotape show him rushing toward the door? Oh, absolutely. There's no, we've never contested the fact that he's involved in an assault here. The question before this Court, and that's raised by the lay testimony, lay opinion issue, is whether, because he was a victim, he was not one of the individuals who were armed. There were six individuals who were involved in the attack. It's a very strange conspiracy. I've been trying to figure out how you have a conspiracy to commit second-degree murder, but you're not contesting that as such, as I understand it, i.e., the existence of such a murder. I tried to look at, you know, as you, I'm sure you know, Judge Berzin, under California law, there is no such a thing, and you could, because if you're conspiring ahead of time, then you're making a plan, so therefore you have the specific intent to commit first-degree murder. Right. And I looked at it and looked at it, and there's several cases that say it's a legitimate crime, and I, it makes no sense to me either. No, therefore, you don't have to have an intent to kill anybody, so there doesn't have to be a conspiracy to kill somebody, as I understand it. There has to be a conspiracy to do something reckless as to which somebody could get killed. That's the part I have difficulty with in terms of the conspiracy, and I answered some of that in the reply brief, because that was the U.S. Attorney's position in terms of why this wouldn't be prejudicial. All they had to show was a specific intent to commit an assault. But again, if you have a conspiracy, it's a specific intent crime. So it still has to be, you're right, it doesn't make sense. If there's, if there exists a specific intent to commit second-degree murder, but it doesn't have to be premeditated, then where's the intent? Well, it doesn't, apparently, because you don't have to intend to murder, so therefore your description of what it was they had to establish doesn't seem to be accurate. In this context, it appears what they had to establish was that it was part of a plan as to which he knew that people were going to use shanks and stab this guy. That seemed to be good enough. Even if that's the case. Whether they intended to murder him or not. Right. Even if that's the case, I think his role in the gang, given that he was not one of the people who was using a shank, had to have been important and persuasive. I mean, he got there, and he was holding this guy down and punching him, and other people at that same time were stabbing him. Is that right? I'm not sure that I agree that the record establishes clearly that he was holding him down. I know there was an assertion of that, I think an argument, but if you look at the videos, which I don't know if they were transmitted to the court, I don't believe. I would like to see them. They were. Were they? Yes. Yeah. It's pretty fuzzy. It's a very tight little space because it's, you know, seven guys inside at Sally Court, and I sure as heck can't tell you, excuse me, who's holding who or, you know, what's going on. I think the record does show he was the first or one of the first ones. And I thought it also showed that he, I mean, there was a narrative that said that he was holding him down. That I'm not remembering because obviously none of the other correctional officers who I thought it was an argument that he was doing that based on the video, but I could be wrong. So if it was error to admit Ogle's testimony that Inglin was, or you're calling him? Murrow, the first last name. Right. Murrow was the number two Sereno gang member in the unit. Was there, how was that prejudicial? So the U.S. attorney argued that his role in the gang meant that he was in on all of the planning, that he knew what was going to happen, that he knew there was a plan to kill, that he probably necessarily knew, I'm going to surmise beyond that, that it would be a basis for the jury to infer that he knew Shanks were going to be involved, because I don't believe there was any testimony explaining why he would believe that Shanks would be involved in the case. And so if he doesn't have any reason to know that- Marginal, because one would think that whatever his role was, I mean, these people did look like an organized thing, and whoever was involved, there was no reason to think that they didn't know what was going to happen. Whatever his role was. I disagree because, I mean, I understand what you're saying, but I disagree in terms of there's only two people with Shanks, and that's where the reckless difference to life comes, even if you're having, you know, six guys beating. It's a huge difference if you have a pointed instrument, and I think the victim in this case ended up having one or two collapsed lungs, so that made the difference. I mean, we had the Gadsden case recently. I wrote a dissent. I think we've gone too far with all this late testimony, but given Gadsden, how could he possibly prevail on that issue? Because I think that the number of cases all talking about police officers, law enforcement officers interpreting telephone calls is way different than somebody testifying basically about the structure and role of a gang. If you look at all the cases that- He wasn't testifying in general about the structure and role of the gang. He was testifying about he was on this residential area, and he saw how they interacted. It's very difficult, I think, or impossible to tell from interactions who's the number two in a group without relying on hearsay, which is one of the problems that- Well, in Gadsden what happened was he testified, the person testified about these Well, when he said something vague, he meant such and such a person. And how did you know that from listening to a bunch of other tapes? And what was that? That was all hearsay. I mean, I think it's all wrong, but we're allowing it to happen. I agree that I think it's wrong, but I also think that there's a ton of cases out there talking about allowing law enforcement officers to interpret communicative, clearly communicative behavior, the things that people say on all these different recorded phone calls and watching patterns of communications and things like that. That's what this guy claimed he was doing. Exactly. Watching patterns of communication. I mean, you say he was basing it on hearsay, but his version is that what he was basing it on was watching how people interacted and the fact that this guy- As I understand his testimony, it wasn't what people told him about this guy's role, but that he saw this mural talking to various different people and interacting and then things would happen afterwards, from which he surmised that he had a leadership role. I didn't think he really did rely on hearsay very much. Well, the record doesn't show the hearsay he relied on in part because, you know, it wasn't elicited by either side about what the basis was. But if you actually go back and look at- The basis was I watched him, and I watched him, what he did every day, and I watched how people interacted. I mean, I watched him walk the pretty loose inference, but he claimed to be able to make it. Can I ask you a question? It seems to me that, first of all, this was not objected to at trial. That's correct. So it's plain error review, number one. Correct. And number two, you may differ with the opinion. You may think it's not a well-grounded opinion. It's not. Maybe it's a little bit loose. But isn't this really the subject of a good cross-examination? Isn't that the way you should handle it? I mean, are you saying- It seems to me that if you're correct, then lay opinion testimony is just out the window. I mean, someone could walk into a factory, observe it for three weeks or three months or three years, and without talking to anybody else in the factory, could develop some opinions about who's the supervisor, who's the manager, who's the lead person, and who's the worker bee, right? Correct. You don't need hearsay to do that. You can just observe that with your eyes, and they could have an opinion about that, and you could cross-examine them at trial about whether that opinion is a well-grounded opinion or not. So I guess I'm just not seeing what the problem is with his having an opinion. Why not just handle it with cross-examination? My time is almost up. May I answer the question? Your time is up, but you may answer the question. Thank you very much. When you're inside a factory, there's a given structure that you don't need hearsay to understand, right? You can see people working at their different little places, and you can watch somebody who doesn't work at a little place and walks around maybe dressed differently than all the other workers, maybe wearing a suit and tie, bending over people, giving them instructions like that, that you don't even have to hear what's being said. But here you have a prison unit where it's certainly not obvious from looking at people which one is the unit representative, who's the leader of which gang. I guess you can, because most of the gangs are racially divided, you could sort of. You don't think prisons have structures, social structures? Oh, no, I know they do, but whether it's obvious from just watching them as opposed to hearing anything they have to say, well, people giving you hearsay information is an entirely different consideration. Maps people make of social interactions in classrooms, for example. Right. You can just map, you know, who's talking to who and how often and so on, and teachers do it. There's certainly circumstances under which you can do it. And as I was preparing, I was realizing, like, for example, if you look at the difference between President Obama and Joe Biden, like Obama, you can know he's the leader. He's always the first one speaking in meetings. He's the one who stands behind the podium, et cetera, et cetera. You can surmise just without hearing what he says that he's the leader. But then when you get to the level behind him, the number twos and the number threes, how would you know? How would you know Biden is vice president? As opposed to being just some sort of other random member of the cabinet. Seriously. Because he says silly things. You addressed the acceptance of responsibility issue because I didn't really understand your argument. He was basically going to trial because he thought the case was overcharged. So he was defending against part of it that he thought was overcharged. So he was defending it. Factually. Right. But my position is if all you have to responsibility is to something, but not as to what he was charged with. Correct. And he was at least partially right because the jury acquitted him of conspiracy to commit first degree murder and assault with intent to commit murder. So that if you're just, if the only reason you're going to trial is to defend against the fact that the government's overcharged the case, you should be able to get acceptance of responsibility if you are forthcoming with the probation officer at the end of the case. What was he actually convicted of? Conspiracy to commit second degree murder and some form of assault, which one of the assault charges, which I'm not remembering off the top of my head. All right. Thank you. Thank you, Your Honors. Good morning, Your Honors. Abigail Evans for the United States. May it please the Court. This lay opinion testimony, as the Court noted, was based on Officer Ogle's four months of observing these particular individuals and their daily interactions, their communicative interactions, and what happened between various members of these gangs, as well as other inmates on the housing unit. The testimony was not, in fact, based on hearsay. And the testimony was something that could, a lay person could, in fact, form an opinion based on reasonable inferences and a reasoning process that makes sense to a regular person. This is not a situation where you have a civilian, where you're comparing to a civilian walking into a prison and all of a sudden, in a very short span of time, making a judgment as to who is a maid member of the Mexican Mafia, who is the commandant of the Sirenios. You have – It's pretty artificial, because I don't know why it ultimately matters whether he's an expert or not. But nobody who – the fact that he was there for four months as a guard had a lot to do, it seems to me, with whether he could understand what these interactions were. I mean, he understood something from his background, not only from this observation, about how prisoners interacted with each other. And he was able to make some judgments as a result of that, perhaps. And maybe they were more or less valid. I don't know how that cuts, though. I mean, I assume if he were qualified as an expert, he would probably be more likely to be believed, rather than just saying, I was there, this is what I think. But it is artificial to say that it had nothing – his ability to make these surmises was as if I walked into that prison. I mean, I probably could be in that prison for four months and never figure anything out. Well, Your Honor, as we put it – as we analogized in our brief and as, Your Honor, analogized to a factory, we're talking here about a chain of command, in a sense. So that it's not necessary to understand even – this witness did not testify to, for example, the rules of the Sereno gang. He testified to the – The first thing he has to know, which I wouldn't know if he hadn't just told me, is that there is a chain of command. That there are gangs in prisons and there is a chain of command. Your Honor, I meant a chain of command in terms of a more general sense, as in a factory, as in a store. Perhaps chain of command was inartfully put. But if you go into a factory or store, any person believes that somebody is in charge. If you go into a prison residential section, you know, absent some knowledge of, you know, the history of prison gangs in the United States, you would just think there were a bunch of prisoners on a hallway. You would, Your Honor, unless you spent four months observing them on a day-to-day basis, seeing as the testimony was that they sit at separate tables, they use separate phones, that you have seen altercations. I would call a high school and find that out without any gangs. So I tend to think that it probably is – it was probably improperly opinion based on his specialized knowledge of prison gangs. But what's your argument that it wasn't prejudicial? Yes, Your Honor. Even if it was an error, it was not prejudicial because there was such overwhelming evidence of the elements of the crime for which this defendant was convicted, which is a conspiracy to commit second-degree murder. As I say, I'm really baffled by that. Are there cases in California that actually explain this crime in Uphalden? Your Honor, as I stand here today, I couldn't cite them for you, but, yes, I agree. It was without a death. I mean, a second-degree murder, I understand a conspiracy doesn't have to result in a crime. But the implied malice part of second-degree murder is kind of a retrospective notion. I mean, it doesn't seem to exist unless somebody's dead. And there's something incredibly artificial. A conspiracy to commit second-degree murder would seem to be any serious assault if they claim to, if they feel like charging it. Well, it does need to arise. It is a conspiracy to commit assault, in a sense, or to put someone in. But I gather it's a more serious crime than conspiracy to commit even aggravated assault. Yes, Your Honor. It's a conspiracy to put the individual in a very high degree of risk of serious injury or death. So you've got a very heightened level of a person entering a conspiracy. It doesn't have to be death. It does not have to be. I know he doesn't have to die, but doesn't it have to be a very high likelihood of death, not just a serious injury? No. According to the case law, it has to be a very high risk of very serious injury or death is the reason. So is it planned to act recklessly as opposed to having an intent to kill? I'm not sure quite what the distinction is. It's a plan to act in such a way that may or may not, and we don't care, kill someone or create serious, serious bodily injury, life-threatening injuries, as the expert testimony of Officer Feeney in this case stated, something that will send you to the hospital, not a beat down in a cell by a couple of guys, something that is premeditated. So if, for example, these guys went in with their shanks, and I don't know how the laic testimony goes to this, but if they went in, if they all agreed that we're going to have, some people are going to beat them and others are going to hold them down and two people are going to have shanks, but the people with the shanks are going to be very careful not to stab them near as hard or as long. All right? We're going to be really careful about that. We're only going to stab them four times. Is that a conspiracy to commit second-degree murder? Yes, Your Honor. To try very hard not to kill them? Yes, Your Honor. We would contend that it is because they have now entered the realm of recklessness with depraved hard indifference to the two. But their agreement is we're not going to kill them. We really don't want to kill them and we're going to make, we're going to, you know, and we're going to do everything we can to not kill them. But we're going to stab. But I believe, Your Honor, in the premise stated that, you know, we will go in, we will go in with our shanks, one of us will hold him. Right. But we're not going to, we know enough, I mean, we know you don't stab him in his heart, you don't stab him in his head, you don't stab him in his lungs. We're not, we want him walking out of that room. Your Honor, the intent, the intent in this crime is to create a situation where the victim is in, is in a situation where he's got a very high risk. It doesn't matter that your intent was, well, we'll stop just short of killing him or we'll only, we'll only go partway. It has to matter. And that could matter to, to the prejudice question in terms of how much you have to demonstrate they agreed to. Well, Your Honor, going to the prejudice question, this jury saw the video of this attack and they heard testimony from several different officers pointing out individuals, quite laborious testimony, pointing out these individuals from various angles leading from well before the attack all the way through the attack. And they, including identifying this defendant as the, as the person holding the victim. So the person holding and punching, he was holding and punching the victim. I'm sorry. I'm sorry? I'm just asking whether there was just one such person. There, in the video what is seen is one person, this defendant, holding and, and punching and then two others stabbing. And then, of course, the melee with the other officers. I'm sorry, the other inmates. So the jury, the jury saw direct evidence of, of, of what happened, of what this defendant did and was, was well, was, was well within their purview to reasonably conclude that this defendant must have known, did know, in fact, in the moment, never mind even before. He had time while he was holding this defendant to know that the injuries that were being inflicted put this victim in a situation that met the intent requirement of the, of the crime for which he was charged, which was reckless indifference, depraved heart indifference to, to human life. The, the, they certainly did not, in fact, have to rely on what may be surplusage here but was not impermissible, which was this testimony about, I perceived him to be the second, the second guy on the unit, the second, the one who went between the first guy and all the other guys and told them what to do and he was allowed to talk to other races, et cetera, where no, I did not see other people doing that. He clearly was, was at a level where he, he knew the drill and when he went in and held, and held him, he wasn't just somebody who was on the outskirts watching this and, and could be imputed with the knowledge. He, he physically facilitated serious injuries to this, to this victim that resulted in punctured lungs and close to carotid artery stabbings and I, I am out of time, Your Honor. All right. Does anyone have any questions? No. All right. Thank you, counsel. Thank you, Your Honor. Let me zip all your time but I'll give you a minute to, for rebuttal, if you have anything you want to add. Thank you. Just extremely briefly, because I know you've spent a lot of time on this case and I know you've been a victim in this case, that still doesn't mean that he knew ahead of time, and I realize there had to be some level of planning, but he knew ahead of time that shanks would be used or how they would be used, if they would be used to just send a message like stab him a couple times in the calf to make sure he never does this again or whether it's, you know, hard candy, try to, try to kill him. In addition, whether this court is entirely persuaded that his role in the gang was murder, I think the court has to remember that the prosecutor in this case thought it was very important and specifically argued his role in the gang as a reason for finding him guilty of that charge. Thank you very much, Your Honors. Thank you, counsel. United States v. Murrow, submitted. We'll take a break.
judges: Smith, Wardlaw, Berzon